Slip Op. 19-130

# UNITED STATES COURT OF INTERNATIONAL TRADE

HABAŞ SINAI VE TIBBI GAZLAR
ISTIHSAL ENDÜSTRISI, A.Ş.,

        Plaintiff,

   and

ICDAS CELIK ENERJI TERSANE VE
ULASIM SANAYI, A.S.,

        Consolidated Plaintiff,

   v.

UNITED STATES,

        Defendant,

   and

REBAR TRADE ACTION COALITION,

        Defendant-Intervenor.

Before: Mark A. Barnett, Judge
Consol. Court No. 17-00204

## OPINION AND ORDER

[Remanding in Part and Sustaining in Part the U.S. Department of Commerce's Final
Results of Redetermination.]

Dated: October 17, 2019

David L. Simon, Law Office of David L. Simon, of Washington, DC, for Plaintiff Habaş
Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.

Matthew M. Nolan and Leah N. Scarpelli, Arent Fox, LLP, of Washington, DC, for
Consolidated Plaintiff Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S.

Elizabeth A. Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division,
U.S. Department of Justice, of Washington, DC, for Defendant United States. With her
on the brief were Joseph A. Hunt, Assistant Attorney General, Jeanne E. Davidson,

Director, and L. Misha Preheim, Assistant Director.  Of counsel on the brief was David Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Alan H. Price, John R. Shane, and Maureen E. Thorson, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Rebar Trade Action Coalition.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") redetermination upon court-ordered remand.  *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 70-1.  Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş") and Consolidated Plaintiff Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") (together, "Plaintiffs") each challenged certain aspects of Commerce's final affirmative determination in the sales at less than fair value investigation of steel concrete reinforcing bar ("rebar") from the Republic of Turkey ("Turkey").[1]  *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 82 Fed. Reg. 23,192 (Dep't Commerce May 22, 2017) (final determination of sales at less than fair value) ("*Final Determination*"), ECF No. 17-5, *as amended by Steel Concrete Reinforcing Bar From the Republic of Turkey and Japan*, 82 Fed. Reg. 32,532 (Dep't Commerce July 14, 2017) (am. final affirmative antidumping duty determination for the Republic of Turkey and antidumping duty orders) ("*Am. Final Determination*"), ECF No. 17-7, and

---

[1] The administrative record associated with the remand results is contained in a Public Remand Record, ECF No. 71-2, and a Confidential Remand Record ("CRR"), ECF No. 71-3.  Parties submitted public and confidential joint appendices containing record documents cited in their briefs.  *See* Public J.A. – Remand Proceeding (Slip Op. 19-10), ECF No. 79; Confidential J.A. – Remand Proceeding (Slip Op. 19-10) ("CRJA"), ECF No. 78.  The court references the confidential version of record documents, unless otherwise specified.

accompanying Issues and Decision Mem., A-489-829 (May 15, 2017) ("I&D Mem."),

ECF No. 17-6.  The court previously sustained Commerce's refusal to employ a

quarterly cost-averaging methodology for either Plaintiff; selection of the invoice date as

the date of sale for Habaş's U.S. sales; and rejection of Habaş's zero-interest short-term

loans to calculate imputed credit expenses.  *See Habaş Sinai ve Tibbi Gazlar Istihsal*

*Endüstrisi, A.Ş. v. United States* ("*Habaş I*"), 43 CIT ___, ___, 361 F. Supp. 3d 1314,

1317–18 (2019).[2]  The court remanded Commerce's calculation of Plaintiffs' respective

duty drawback adjustments and the use of partial adverse facts available in relation to

certain sales for which Icdas could not provide manufacturer codes.  *Id.*

On May 17, 2019, Commerce filed its Remand Results.  Therein, Commerce

revised its method of calculating Plaintiffs' duty drawback adjustments to U.S. price and

made a circumstance of sale ("COS") adjustment to normal value to increase it by the

same amount as the duty drawback adjustment; and Commerce also provided

additional reasoning to support its use of partial adverse facts available with respect to

Icdas.  Remand Results at 1–2, 7–20, 33–41, 44–45.  The changes made by

Commerce reduced Habaş's weighted-average dumping margin from 5.39 percent to

4.98 percent and Icdas's from 9.06 percent to 8.66 percent.  Remand Results at 21.

Habaş and Icdas filed comments opposing Commerce's use of a COS

adjustment.  Comments of Pl. Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. on

Redetermination on Remand ("Habaş's Cmts.") at 2–10, ECF No. 74; Pl. Icdas Celik

---

[2] *Habaş I* presents additional background on this case, familiarity with which is
presumed.

Enerji Tersane ve Ulasim Sanayi A.S.'s Comments on Remand Redetermination

("Icdas's Cmts.") at 3–13, ECF No. 75.  Icdas continues to challenge Commerce's use

of partial adverse facts available.  Icdas's Cmts. at 13–14.  Defendant United States

("the Government") and Defendant-Intervenor Rebar Trade Action Coalition ("RTAC")

filed comments in support of the Remand Results.  Def.'s Resp. to Pls.' Comments on

the Remand Redetermination ("Gov't's Reply Cmts."), ECF No. 76; Rebar Trade Action

Coalition's Resp. to Comments on Final Results of Redetermination ("RTAC's Reply

Cmts."), ECF No. 77.

For the reasons discussed herein, the court sustains Commerce's duty drawback

adjustment as applied to export price, remands Commerce's decision to make a COS

adjustment in the same amount, and sustains Commerce's use of partial adverse facts

available with respect to Icdas.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[3] and 28 U.S.C. § 1581(c) (2012).

---

[3] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition.  However, The Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015), made several amendments to the antidumping and countervailing duty laws. Section 502 of the TPEA amended 19 U.S.C. § 1677e, and section 504 amended 19 U.S.C. § 1677b.  *See* TPEA §§ 502, 504.  These TPEA amendments affect all antidumping duty determinations made on or after August 6, 2015.  *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Dep't Commerce Aug 6, 2015).  Accordingly, all references to 19 U.S.C. §§ 1677e and 1677b are to the amended version of the statutes.

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The

results of a redetermination pursuant to court remand are also reviewed for compliance

with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___,

___, 273 F. Supp. 3d 1314, 1317 (2017) (citation and internal quotation marks omitted).

**DISCUSSION**

**I.   Duty Drawback and Circumstance of Sale Adjustments**

   **A.  Commerce's Duty Drawback Calculation Methodologies Prior to *Habaş I***

To determine whether the subject merchandise is being sold at less than fair

value, Commerce compares the export price or constructed export price[4] of the subject

merchandise to its normal value.  *See generally* 19 U.S.C. §§ 1673 *et seq.*  Generally,

an antidumping duty is the amount by which the normal value of a product—typically, its

price in the exporting country—exceeds export price, as adjusted.  *See id.* § 1673.  One

of the adjustments Commerce makes to export price pursuant to 19 U.S.C. § 1677a(c)

is known as the "duty drawback adjustment."  Specifically, Commerce is to increase

export price by "the amount of any import duties imposed by the country of exportation

which have been rebated, or which have not been collected, by reason of the

exportation of the subject merchandise to the United States."  *Id.* § 1677a(c)(1)(B).  This

statutory adjustment is intended to prevent the dumping margin from being increased by

---

[4] U.S. price may be based on export price or constructed export price.  Because the distinctions between export price and constructed export price are not at issue in this case, the court generally will refer only to export price or U.S. price.  Such references, however, may be understood as including constructed export price.

import taxes that are imposed on inputs used to produce subject merchandise, if those

import taxes are rebated or exempted from payment when the subject merchandise is

exported to the United States.  *See Saha Thai Steel Pipe (Public) Co. Ltd. v. United*

*States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011); *Wheatland Tube Co. v. United States*, 30

CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), *rev'd on other grounds*, 495 F.3d 1355

(Fed. Cir. 2007).  The adjustment accounts for the fact that imported inputs remain

subject to the import duties when consumed in the production of the foreign like product,

"which increases home market sales prices and thereby increases [normal value]."

*Saha Thai*, 635 F.3d at 1338; *see also* Remand Results at 7.

"Until recently, Commerce calculated the duty drawback adjustment to U.S. price

. . . by dividing rebated or exempted duties by total exports and adding the resultant per

unit duty burden to the export price."  *Habaş I*, 361 F. Supp. 3d at 1320.  When

producers were exempt[5] from the payment of import duties, Commerce also increased

cost of production and constructed value[6] to account for the cost of the exempted duties

---

[5] A duty exemption program is different from a duty rebate (or reimbursement) program.
For a rebate program, "import duties are paid and later refunded by the government of
the exporting country."  Remand Results at 7–8.  Thus, the duties are usually recorded
as a "direct material cost" in the producer's books and a separate revenue is recorded
to book the amount of any drawback granted in connection with an export transaction.
*Id.* at 8.  For an exemption program, an "off-the-books" liability is created upon
importation of the input, which is later forgiven when the finished product is exported.
*Id.* at 17.  In that case, the producer typically will "neither record an amount for import
duties as a direct material cost, nor recognize a separate revenue for the amount of
duty drawback granted for the export transaction."  *Id.* at 8.

[6] Commerce calculates normal value using sales in the home market or a third country
market that are at or above the cost of production.  19 U.S.C. § 1677b(b)(1).  When
there are no such sales, Commerce calculates normal value "based on the constructed
value of the merchandise."  *Id.*  The cost of production includes "the cost of materials

for which the producer remained liable until the exemption program requirements were

satisfied.  *Habaş I*, 361 F. Supp. 3d at 1320; *see also Saha Thai*, 635 F.3d at 1341–44

(affirming the upward adjustment to cost of production).  In 2016, Commerce modified

its duty drawback adjustment "by allocating exempted duties over total production rather

than exports."  *Habaş I*, 361 F. Supp. 3d at 1320.  Commerce adjusted its methodology

in response to assertions that margin distortions arose when foreign producers "use[d]

fungible inputs both from foreign sources, which incur[red] import duties, and domestic

sources, which [did] not."  *Id.*  Commerce reasoned that "the larger denominator on the

cost-side [i.e., total production] resulted in a smaller adjustment to normal value than

U.S. price"; consequently, it determined that "equalizing the denominators used in each

adjustment" ensured that an equal amount would be added to U.S. price and normal

value and the agency would compare the two values on a "duty neutral" basis.  *Id.* at

1320–21.

      In the administrative proceeding underlying *Habaş I*, Commerce used this

modified duty drawback methodology to calculate the adjustment to U.S. price and

make a corresponding equal upward adjustment on the cost side pursuant to *Saha*

*Thai*.  *See* I&D Mem. at 12–13 & n.50.  The court remanded the duty drawback

adjustment to U.S. price—specifically, Commerce's allocation of the exempted duties

over total production—as "inconsistent with the clear statutory linkage between [the

---

and of fabrication or other processing" used in manufacturing; "selling, general, and
administrative expenses"; and the cost of packaging.  *Id.* § 1677b(b)(3).  Constructed
value includes similar expenses and an amount for profit.  *Id.* § 1677b(e).

foregone] duties and exported merchandise." *Habaş I*, 361 F. Supp. 3d at 1322

(collecting cases reaching the same conclusion).  The court reasoned that "Congress . .

. clearly intended the adjustment to capture the amount of duties Plaintiffs would have

paid on their export sales but for the exportation of that merchandise"; thus, "[a]llocating

Plaintiffs' exempted duties over total production" contravened "section 1677a(c)(1)(B)

because it attributes some of the [duty] drawback to domestic sales, which do not earn

drawback, and fails to adjust export price by the amount of the import duties exempted

by reason of exportation." *Id.* at 1323 (internal quotation marks and citation omitted).

The court further rejected Commerce's reliance on *Saha Thai* to support its revised

methodology. *Id.* at 1323–24.  While the cost-side adjustment approved by the *Saha

Thai* court "ensure[s] that normal value and U.S. price are compared on a mutually-duty-

inclusive basis," the appellate court "never stated or otherwise inferred that the

adjustments to [U.S. price] and normal value must be equal . . . in order to render the

comparison between U.S. price and normal value duty neutral." *Id.* at 1323 (internal

citations and internal quotation marks omitted).  The court remanded the issue "to the

agency to revise its calculation of the duty drawback adjustment using exports as the

denominator rather than total production." *Id*. at 1324.

## B.  Commerce's Calculation Methodology on Remand from *Habaş I*

In accordance with *Habaş I*, Commerce recalculated the duty drawback

adjustment using exports as the denominator.  Remand Results at 13, 17.  In addition,

however, Commerce made a circumstance of sale adjustment to normal value to add

the same per-unit amount of duty "in order to achieve a fair comparison." *Id.* at 15–16.

Habaş and Icdas imported several inputs subject to varying duties and purchased the same inputs from domestic sources.  *Id.* at 13.  Habaş and Icdas participated in a duty exemption program, and, thus, did not record liability for the import duties in their books and records.  *Id.* at 13, 14.  According to Commerce, when subject merchandise can be produced from various inputs, only some of which are dutiable imports, or from inputs that are procured from foreign and domestic sources, "the presumption that [normal value] includes the full duty proportionate to the full duty drawback is uncertain."  *Id.* at 8.  Commerce asserts that most countries permit substitution of inputs, which means that, "while the actual imported material subject to duty is fungible and can be consumed in any of the finished goods, it is assigned by the company to exported finished goods for purposes of the program."  *Id.*  Thus, while the statute requires Commerce to increase U.S. price to account for the duties exempted by reason of exportation, there is a lesser amount of (or no) import duties reflected in normal value.  *Id.* at 9.  Commerce provided "the following example, wherein one unit of input is domestically sourced for $10 and one unit of input is imported for $10, plus a $5 duty":

> Under the standard way of determining costs for general accounting purposes, the company's average cost for the inputs per unit is the domestic input of $10 plus the imported input of $15 ($10 + $5) divided by two units of input which equals $12.50 (i.e., $10 + $15 = $25 and $25/2 = $12.50).  Thus, $12.50 is the annual average per-unit input cost, including only $2.50 of the import duty for each unit.  However, upon export of one unit of the finished good, the duty drawback scheme allows the entire $5 of import duties to be rebated or forgiven.  As a result, following this logic, the adjusted U.S. price reflects $5 per unit of duties, while the [normal value] cost of production includes an average of $2.50 per unit.  This creates an imbalance in the amount of duties on each side of the dumping

> equation, artificially lowering the margin by $2.50 of duties (assuming
> through the cost test the average home market price would include the
> $2.50 of duties in the cost of the input).

*Id.*

As discussed, Commerce initially attempted to remedy this perceived distortion

by limiting the duty drawback adjustment to the amount of duties imputed on the cost-

side. *Id.* at 10–11. In response to several opinions from this court holding that the

reduced duty drawback adjustment was unlawful, Commerce developed a new

methodology. *See id.* at 11 & n.42 (collecting cases). Specifically, in those cases,

Commerce applied the full duty drawback adjustment to U.S. price, applied the cost-

side adjustment pursuant to *Saha Thai*, and also made a COS adjustment to normal

value—ultimately imputing the same amount of per-unit duties to normal value that were

added to U.S. price. *Id.* at 11. In other words, using the example above, Commerce

added (1) $5 per unit of import duties to U.S. price; (2) $2.50 per unit to cost; and (3)

$2.50 per unit to normal value as a COS adjustment. *Id.*

Upon review by another judge of this court, the court determined that the agency

improperly double-counted the amount of duties included within normal value. *Id.* at

11–12 & n.44 (citing *Uttam Galva Steels Ltd. v. United States*, 43 CIT ___, ___, 374 F.

Supp. 3d 1360, 1364 (2019)). Taking that court opinion into account, while also

asserting that the double-counting finding was in error, Commerce further changed its

methodology in this case to provide for two COS adjustments: the first COS adjustment

removes all duties from normal value and the second COS adjustment "add[s] to

[normal value] the same per-unit amount of duty added to U.S. price." *Id.* at 14–15.

Commerce explained that the second COS adjustment is necessary

> because: (1) the import duty program and drawback provision impose a
> different set of accounting and duty treatments dependent upon which
> market the finished good was sold and the markets from which the
> imported input is sourced; and (2) the effect of the different sourcing of
> inputs and associated duty costs, and how the duty drawback is treated
> for the U.S. and home market sales.

*Id.* at 15.  The combined effect of a duty exemption scheme and domestic sourcing of

inputs for foreign-like product sold in the home market, according to Commerce, is to

"permit[] the assignment of imported inputs and the associated import duties to export

sales, while attributing the domestic purchases exclusive of duty to domestic sales." *Id.*

This treatment differs "from standard cost accounting and the respondent's normal

books and records, which calculate an annual weighted-average price of inputs and is

allocated to overall production versus market-specific production." *Id.*  According to

Commerce, this results in a duty-inclusive U.S. price being compared to a normal value

that reflects less or no duties.  *Id.*

　　　In the Remand Results at issue here, Commerce explained that it did not make

the first COS adjustment to remove booked duties because Plaintiffs participated in a

duty exemption program and "the [constructed value] and home market prices in this

review . . . are completely duty-exclusive from any duties eligible for duty drawback . . .

."  *Id.* at 14.  Commerce did, however, make the second COS adjustment to add to

normal value the same per-unit amount of duties the agency added to U.S. price,

"ensuring that both sides of the dumping equation contain the same amount of per-unit import duties." *Id.* at 15.[7]

In the remand proceeding, Habaş and Icdas challenged Commerce's reliance on the concept of duty neutrality and its authority to adjust normal value pursuant to the circumstance of sale provision. *See id* at 26–33. Commerce explained that the concept of duty neutrality supports its methodology because the methodology prevents the duty drawback adjustment from artificially decreasing the dumping margin. *Id.* at 34. Commerce explained that it made the COS adjustment "to account for differences not otherwise accounted for in the statute." *Id.* at 37.

The normal value provision of the statute gives Commerce the authority to increase or decrease normal value "by the amount of any difference (or lack thereof) between" U.S. price and normal value, "other than a difference for which allowance is otherwise provided under this section," that Commerce determines is "wholly or partly due to . . . other differences in the circumstances of sale." 19 U.S.C. § 1677b(a)(6)(C)(iii). Commerce explained that the COS provision is the only provision

---

[7] Commerce did not impute exempted import duties to the cost of production as would be consistent with *Saha Thai*. *See* Draft Results of Redetermination Pursuant to Remand of the Antidumping Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey: Am. Final Calculation for Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas Remand Calc. Mem.") at 2, CRR 1, CRJA Tab 11; Draft Results of Redetermination Pursuant to Remand of the Antidumping Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey: Am. Final Calculation for Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.Ş. ("Habaş Remand Calc. Mem.") at 2, CRR 9, CRJA Tab 12. Instead, Commerce made a COS adjustment to normal value (regardless of whether it was based on home market sales or constructed value). Icdas Remand Calc. Mem. at 3; Habaş Remand Calc. Mem. at 3.

that "address[es] differences in the home market price relating to import duties," by

which Commerce means "taxes imposed only on particular inputs, at particular rates,

from particular markets, input into particular goods, which can be claimed and rebated

only when resold to particular markets."  Remand Results at 37.  In this case,

Commerce explained, Habaş and Icdas import substitutable inputs (such as steel billets

and scrap) that "incur import duties at different tax rates, (or not at all), while the

domestically sourced identical inputs incur no duties."  *Id.*  The Turkish duty drawback

scheme permits Habaş and Icdas "to assume that the exported product consumed the

inputs subject to duties," and the duty drawback provision, 19 U.S.C. § 1677a(c)(1)(B),

likewise "implies that imported inputs . . . subject to import duties . . . were consumed in

making the exported products."  *Id.* at 37–38.  Commerce described the different

"circumstance of sale" as the assignment of duty costs to particular products "based on

where they are sold."  *Id.* at 39.

As Commerce explains it, the agency confronted the following: (1) the

requirement to increase U.S. price to account for import duties foregone by reason of

exportation of the subject merchandise in order "to make a fair comparison" to a normal

value that is "presumably set to recover such import duties" on goods sold domestically;

(2) a normal value that does not contain any import duties because dutiable inputs are

allocated to export sales; and (3) a statute that is silent on what Commerce should do in

that situation.  *Id.* at 38.  Commerce determined that "[t]he 'other differences in the

circumstances of sale' provision is the only means" at its disposal "to ensure a fair

comparison" between a duty-exclusive normal value and duty-inclusive U.S. price.  *Id.*

### C. Commerce's COS Adjustment Contravenes the Plain Language of the Applicable Statute and Regulation

Plaintiffs raise several challenges to Commerce's Remand Results, foremost of which is that the statutory COS provision, along with Commerce's implementing regulation, do not justify an offset to the statutory duty drawback adjustment.  Habaş's Cmts. at 6–10; Icdas's Cmts. at 10–11.  Plaintiffs are correct.

Congress authorized Commerce to adjust normal value for differences between normal value and U.S. price that are not otherwise provided for in the statute and are due to "other differences in the circumstances of sale."  19 U.S.C. § 1677b(a)(6)(C)(iii). In the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 224, 108 Stat. 4809 (1994), Congress explained that:

> Commerce will continue to employ the circumstance-of-sale adjustment to adjust for differences in direct expenses and differences in selling expenses of the purchaser assumed by the foreign seller, between normal value and both export price and constructed export price. . . .  [D]irect expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment.

Uruguay Round Agreements Act, Statement of Administrative Action, H R. Doc. No. 103-316, vol. 1, at 828 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4167.[8]  Consistent with the SAA, Commerce's regulations limit COS adjustments consistent with 19 U.S.C.

---

[8] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

§ 1677b(a)(6)(C)(iii) to "direct selling expenses and assumed expenses," with one

exception for commissions paid in one market that is not relevant here.  19 C.F.R.

§ 351.410(b) (providing for COS adjustments "only for direct selling expenses and

assumed expenses").  Direct selling expenses are defined as "expenses, such as

commissions, credit expenses, guarantees, and warranties, that result from, and bear a

direct relationship to, the particular sale in question."  *Id.* § 351.410(c).  Assumed

expenses are defined as "selling expenses that are assumed by the seller on behalf of

the buyer, such as advertising expenses."  *Id.* § 351.410(d).

According to Habaş, Commerce's assertion of broad authority to make a COS

adjustment "to account for differences not otherwise accounted for in the statute"

contravenes congressional intent and the agency's regulations that constrain

Commerce's discretion in this area.  Habaş's Cmts. at 6–9.  Habaş argues that the

Federal Circuit has made "clear that a COS adjustment may not be used to adjust a

'variance caused by the operation of the [Antidumping] Act.'"  *Id.* at 9 (quoting *Zenith*

*Electronics Corp. v. United States*, 988 F.2d 1573, 1581 (Fed. Cir. 1993)).  Icdas

likewise argues that "import duties that have not been collected—on inputs destined for

export sales—[do not] qualify as a COS, let alone as a selling expense."  Icdas's Cmts.

at 10.  Icdas also relies on *Zenith* to support its position that Commerce may not

effectively nullify the duty drawback adjustment to U.S. price through its authority to

make COS adjustments.  *Id.* at 11 (citing *Zenith*, 988 F.2d at 1581).

The Government argues that "Turkey's duty drawback scheme and the

antidumping law duty drawback provision transform the import duties subject to the duty

drawback scheme into a direct selling expense."  Gov't's Reply Cmts. at 6 (citing

Remand Results at 15–17, 39); *see also id*. at 6–7 (arguing that "Commerce specifically

found that the duty drawback expense constituted a direct sales expense within the

statutory and regulatory language").  The Government also finds support in the fact that

drawn back duties are "capped by the amount of the duty in the dutied input that is

included in the specific sale for export."  *Id.* at 6.  The Government further argues that

Commerce's methodology is not precluded by the *Zenith* line of cases.  *Id.* at 13–15.

RTAC argues that the circumstance of sale provision is intended to "facilitate

efficient comparison between foreign market value [now termed normal value] and

purchase price [now termed export price]."  RTAC's Reply Cmts. at 12 (quoting S. Rep.

No. 85-1619, at 7 (1958)).  According to RTAC, the provision and its purpose remained

largely unchanged when Congress amended the trade remedy laws in 1979 and 1994.

*Id.*  For that reason, RTAC argues, the SAA cannot fairly be read to "limit[] Commerce's

authority to make COS adjustments."  *Id.*  RTAC further asserts that "adjustments to the

[normal value] side of the antidumping equation are in this case necessary to create the

conditions under which Congress assumed that the [export price]-side drawback

adjustment would operate."  *Id.* at 13.  Thus, RTAC believes that *Saha Thai* supports

Commerce's use of a COS adjustment in this case.  *Id.* at 13–14 & n.3.

Commerce's COS adjustment to normal value contravenes both the statutory

provision and the agency's implementing regulation.  Beginning with the statute, the

court's review of Commerce's interpretation and implementation of a statutory scheme

is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837 (1984).  First, the court must determine "whether Congress has directly spoken to

the precise question at issue."  *Chevron*, 467 U.S. at 842.  If Congress's intent is clear,

"that is the end of the matter," and the court "must give effect to the unambiguously

expressed intent of Congress."  *Id.* at 842–43.  Only "if the statute is silent or

ambiguous," must the court determine whether the agency's action "is based on a

permissible construction of the statute."  *Id.* at 843.  The court may find that "Congress

has expressed unambiguous intent by examining 'the statute's text, structure, and

legislative history, and apply the relevant canons of interpretation.'"  *Gazelle v. Shulkin*,

868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378

(Fed. Cir. 2012)).

Commerce determined that adjustments to normal value pursuant to 19 U.S.C.

§ 1677b "do not address differences in the home market price relating to import duties

other than through the COS provision," Remand Results at 37, and "the 'other

differences in the circumstances of sale' provision is the only means to ensure a fair

comparison," *id.* at 38.  Notwithstanding Commerce's claims, the statutory COS

provision "is not an omnibus provision to be used . . . for whatever adjustment [the

agency] seek[s] to effect."  *Zenith Electronics Corp. v. United States*, 14 CIT 831, 837,

755 F. Supp. 397, 406 (1990).

This more limited understanding of the COS provision is confirmed by the

legislative history.  The Senate report accompanying the enactment of the COS

provision lists as adjustable differences "terms of sale, credit terms, and advertising and

selling costs," all of which are attendant to the sale of the merchandise.  S. Rep. No. 85-

1619, at 7 (1958).  When Congress enacted the URAA, including section 1677b in its

current form, it intended for "Commerce's current practice with respect to [the COS]

adjustment to remain unchanged" (with the exception of the "constructed export price

offset" that is not relevant here).  SAA at 828, *reprinted in* 1994 U.S.C.C.A.N. at 4167.

Prior to enactment of the URAA, Commerce's COS regulation provided that differences

in the circumstances of sale for which it would "make reasonable allowances normally

[were] those involving differences in commissions, credit terms, guarantees, warranties,

technical assistance, and servicing," in addition to "differences in selling costs (such as

advertising) incurred by the producer or reseller" generally to the extent those costs

were assumed "on behalf of the purchaser."  19 C.F.R. § 353.56(a)(2) (1990).

Although the examples listed in the regulation and legislative history are not

exhaustive, they are all examples of "expenses made to support and promote sales."

*Torrington Co. v. United States*, 156 F.3d 1361, 1366 (Fed. Cir. 1998) (Archer, J.,

dissenting) (disagreeing that certain freight costs constituted selling expenses).

Adjustments for these types of selling expenses are necessary in order to compare

normal value and U.S. price "at a similar point in the chain of commerce."  *Maverick*

*Tube Corp. v. Toscelik Profil*, 861 F.3d 1269, 1274 (Fed. Cir. 2017) (citation omitted).

Commerce's adjustment for an asserted difference in duty costs arising from Plaintiffs'

different sourcing of inputs and the statutory duty drawback adjustment pursuant to 19

U.S.C. § 1677a(c)(1)(B) is not a circumstance surrounding the sale of the merchandise.

Notwithstanding Commerce's strained attempt to describe its method using terms

relevant to a COS adjustment, Commerce, in fact, made the adjustment to remedy what

it characterized as a distortion[9] that arose by operation of the statutory drawback

adjustment on a particular set of facts.  *See* Remand Results at 9, 38.  In so doing,

Commerce directly and completely nullified the duty drawback adjustment to U.S. price

by adding to normal value the same per-unit amount of exempted duties added to U.S.

price.  *Id.* at 16.  Commerce may not, however, use the COS provision to "effectively

writ[e] [a separate adjustment] section out of the statute."  *Zenith*, 988 F.2d at 1581.[10]

---

[9] In *Habaş I*, the court noted that Commerce's concern regarding distortion is based on
the unsubstantiated assumption that "the cost of the domestically-sourced inputs
approximates the import duty-exclusive cost of the foreign-sourced input."  361 F. Supp.
3d at 1323 n.14 (emphasis omitted) (quoting *Eregli Demir ve Celik Fabrikalari T.A.S v.
United States*, 42 CIT ___, ___, 357 F. Supp. 3d 1325, 1334 n.15 (2018)).  The court
observed that a domestic supplier of a dutiable input "would price its product at a level
competitive with the duty-inclusive cost of the imported input," and, that "[i]n such a
scenario, it is difficult to understand the margin effect of a proper duty drawback
adjustment as distortive."  *Id.* (emphasis omitted) (quoting same).  Commerce's
explanation of the distortion that arises by operation of the duty drawback adjustment in
the Remand Results indeed assumes that domestically-sourced and foreign-sourced
inputs share the same unit price ($10) without regard to any market effect from the 50
percent duty in Commerce's example.  Remand Results at 9.  Commerce does not
explain why this is so, nor does Commerce address the court's observation in the
Remand Results and the record does not otherwise support the agency's assumption.
*See id.*  RTAC points to record evidence demonstrating that Habaş and Icdas do not
pay import duties to support its belief that "a reasonable domestic supplier of the inputs
would *not* price duty-inclusively, because such pricing would disadvantage the domestic
supplier relative to input supply."  RTAC's Reply Cmts. at 10.  However, to the extent
that Habaş and Icdas both have home market sales, domestic suppliers of inputs do, in
fact, compete with duty-inclusive imports (priced at $10 + $5 duties in the example);
therefore, RTAC's argument is not supported, nor does it make logical, economic sense
simply to assume that domestic suppliers would continue to price at the duty-exclusive
import price ($10 in the example).
[10] Parties debate the applicability of *Zenith* to the court's review of Commerce's
determination here.  *See* Habaş's Cmts. at 9; Icdas's Cmts. at 11; Gov't's Reply Cmts.
at 13–15; RTAC's Reply Cmts. at 7; *cf.* Remand Results at 34–37.  While *Zenith*
addressed Commerce's use of a COS adjustment to remedy the effect on the
antidumping margin of a separate pre-URAA statutory provision relating to domestic

Commerce's circumvention of the statutory scheme cannot be saved by its appeal to the need "to ensure a fair comparison."  Remand Results at 38.  Section 1677b requires that "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).  As the Federal Circuit has recognized, the statute expressly set out how to determine normal value "[i]n order to achieve a fair comparison with the export price or constructed export price." *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004) (characterizing the enumerated requirements and adjustments to normal value in subsections 1677b(a)(1)–(8) as "exhaustive").  Thus, the "fair comparison" requirement is met when normal value is calculated in accordance with the statute and does not provide Commerce with additional authority to make adjustments "beyond those explicitly established in the statute."  *Id.; cf. Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir. 2001) (when U.S. price is based on constructed export price, a "fair comparison" to normal value is achieved by making statutory adjustments in order to arrive at the appropriate level of trade).  Commerce itself made this point when it promulgated the rule in its current form.  *See Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,346 (Dep't Commerce Feb. 27, 1996) (proposed rule) (explaining that the statute and the Antidumping Agreement "specify in detail the methods by which [the fairness] requirement is satisfied" and declining to inure to itself the authority to go further).

---

taxes, the court's statements regarding Commerce's authority pursuant to the COS provision remain instructive, if not binding, here.  *See Zenith*, 988 F.2d at 1580–82.

Throughout the almost 25 years of administration and litigation pursuant to the Uruguay Round Agreements Act version of the Tariff Act of 1930, and in the years that preceded, parties have argued for and against various extra-statutory adjustments as necessary to a "fair comparison" or allowing for "an apples-to-apples" comparison. Generally speaking, domestic interested parties have asserted that certain adjustments leading to higher dumping margins are needed to be fair, and respondent interested parties have asserted that other adjustments leading to lower dumping margins are needed to be fair.  However, where, as here, Congress has provided for an adjustment in one part of the dumping calculation and not another, it is not for Commerce or the court to circumvent the legislative framework even if the purported goal is to render an allegedly fairer comparison.  *See, e.g.*, *Ad Hoc Comm. of AZ-NM-TX-FL Prods. of Gray Portland Cement v. United States*, 13 F.3d 398, 401–03 (Fed. Cir. 1994).  Accordingly, Commerce's COS adjustment to offset the effect of the statutory duty drawback adjustment must be rejected as inconsistent with the statute.

While regulatory consistency cannot save an adjustment otherwise inconsistent with the statute, the court notes that Commerce's COS adjustment also contravenes the plain language of its regulation.[11]  The Federal Circuit has held that Commerce's

---

[11] Commerce's regulation provides for a COS adjustment "only for direct selling expenses and assumed expenses."  19 C.F.R. § 351.410(b).  While Commerce did not specify which of the two categories it considered the adjustment at issue to fall within, it sought to explain why certain "duty costs" "are directly related to the sales in different markets."  Remand Results at 39.  From this the court discerns that Commerce considers the COS adjustment to fall within the category for direct selling expenses.  *See* 19 C.F.R. § 351.410(c) (defining "direct selling expenses" as expenses "that result from, and bear a direct relationship to, the particular sale in question").

identification of a particular cost as a "selling expense[] properly the subject of a COS

adjustment" represents an instance of the agency "simply interpreting its own

regulations" to which the court owes "substantial deference." *Torrington Co.*, 156 F.3d

at 1364 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also*

*Auer v. Robbins*, 519 U.S. 452, 461–62 (1997) (according deference to an agency's "fair

and considered" interpretation of its own ambiguous regulation).  More recently,

however, the U.S. Supreme Court cautioned that "a court should not afford *Auer*

deference unless the regulation is genuinely ambiguous."  *Kisor v. Wilkie*, 139 S. Ct.

2400, 2415 (2019).  "[B]efore concluding that a rule is genuinely ambiguous, a court

must exhaust all the 'traditional tools' of construction."  *Id.* (quoting *Chevron*, 467 U.S. at

843 n.9).  Those "tools" consist of "the text, structure, history, and purpose of a

regulation."  *Id.*

Turning first to the plain language of the regulation, the court must "consider the

terms in accordance with their common meaning."  *Mass. Mut. Life Ins. Co. v. United*

*States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015) (quoting *Lockheed Corp. v. Windnall*, 113

F.3d 1225, 1227 (Fed. Cir. 1997)).  A "direct selling expense" must be (1) an "expense[]"

that (2) "result[s] from, and bear[s] a direct relationship to, the particular sale in

question."  19 C.F.R. § 351.410(c).  Commerce's regulation includes "commissions,

credit expenses, guarantees, and warranties" as examples of direct selling expenses.

*Id*.  All of these examples involve an actual or imputed expenditure by the respondent.[12]

---

[12] Credit expenses are typically imputed expenses for the seller, representing the time
value of money for the period between shipment and payment.  *See generally* Import

Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference.   Commerce's adjustment for differences in import duties, *see* Remand Results at 15, 38, ignores the fact that Habaş and Icdas "*did not incur and record any actual duty costs* in their normal books and records.   Rather, an 'off-the-books' liability was generated when inputs were imported under the IPR program, *and that liability was later reversed* upon exportation of subject merchandise to the United States and other markets."   *Id.* at 17 (emphasis added); *see also id.* ("Habaş and Icdas *did not pay* or record as a cost *any duties* associated with the IPR exemption program") (emphasis added).   Here, the record is clear that Plaintiffs incurred *no expense* respecting import duties on inputs consumed in the production of subject merchandise.   *See id.* at 17, 39.

Commerce focused on the fact that U.S. price is ultimately duty-inclusive as the basis for the COS adjustment; however, such is the case by operation of the duty drawback adjustment.   *Id.* at 38–39.   Commerce offers no explanation as to how a statutory adjustment to U.S. price constitutes an "expense" as the term is commonly understood or, indeed, a circumstance of sale.   The duty drawback adjustment resulted from the operation of law, it was not incurred as part of the sales process.   When Commerce promulgated the current rule, it explicitly rejected drafting the regulation "in such a way as to essentially function as a catch-all provision to achieve 'fairness,'"

---

Admin. Policy Bulletin 98.2: Imputed Credit Expenses and Interest Rates (Feb. 23, 1998), available at https://enforcement.trade.gov/policy/bull98-2.htm (last visited Oct. 17, 2019).   Such expenses recognize the value to the buyer, and the cost to the seller, of extending payment terms.   *Id.*

finding the approach inconsistent with the carefully crafted statutory scheme.[13]

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,346.  In attempting to do

so now, Commerce has done what the Supreme Court said it could not do: "creat[ing]

*de facto* a new regulation" "under the guise of interpreting a regulation."  *Kisor*, 39 S. Ct.

at 2415 (citation omitted).[14]

---

[13] The court is concerned by the Government's misleading alteration of the regulation in its reply comments, to wit: "The regulations further provide '[i]n general . . . the Secretary will make circumstance of sale adjustments . . . only for direct selling expenses and assumed expenses.'"  Gov't's Reply Cmts. at 6 (quoting 19 C.F.R. § 351.410(b)).  The Government's alteration suggests that the phrase "in general" forms part of the sentence describing the adjustments made pursuant to the regulation in such manner that it appears to broaden the scope of the regulation.  The regulation actually provides:

> (b) In general. With the exception of the allowance described in paragraph (e) of this section concerning commissions paid in only one market, the [agency] will make circumstances of sale adjustments under [19 U.S.C. § 1677b](6)(C)(iii) . . . only for direct selling expenses and assumed expenses.

19 C.F.R. § 351.410(b).  Thus, the phrase "In general" is the heading to subsection (b), not part of the text.  Rather than speaking to the scope of the permissible adjustments, it speaks to the scope of the regulation, which, with the exception of certain commissions, permits adjustments "*only* for direct selling expenses and assumed expenses."  *Id.* (emphasis added).  It is a well-settled interpretive rule that "the heading of a section . . . cannot undo or limit that which the text makes plain."  *Brotherhood of R. R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947) (construing a statute); *see also Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (principles of statutory interpretation apply likewise to regulations).  The Government's alteration, which seeks to negate the explicit limitation the word "only" places on the types of permissible adjustments, is therefore misleading and erroneous.

[14] RTAC's avoidance of the limits of the regulation based on the asserted need "to create the conditions under which Congress assumed that the [export price] drawback adjustment would operate" likewise must fail.  *See* RTAC's Reply Cmts. at 13.  Once promulgated, an agency must adhere to its own regulations.  *See, e.g.*, *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1355 (Fed. Cir. 2006); *Drumheller v. Dept. of Army*, 49 F.3d 1566, 1574 (Fed. Cir. 1995) (collecting cases).

RTAC's argument that *Saha Thai* supports Commerce's use of a COS adjustment also fails.  *See* RTAC's Reply Cmts. at 13–14 & n.3.  There, the Federal Circuit affirmed Commerce's interpretation of cost-related provisions of the normal value statute to include "implied costs" (i.e., unbooked/exempted duty costs) as well as "actual costs" for purposes of calculating a duty-inclusive normal value to compare to a U.S. price subject to the duty drawback adjustment.  *Saha Thai*, 635 F.3d at 1342–43.  In contrast to the cost-side adjustment affirmed in *Saha Thai*, the COS provision adjusts normal value even when normal value is based on home market sales and that sales price is greater than the cost of production.  *See* 19 U.S.C. § 1677b(a)(1)(B), (a)(6)(C)(iii), (b)(1).  This approach is distinct from *Saha Thai* because it presumes that a theoretical duty liability has a price effect on home market sales.  Such a presumption is contrary to the *Saha Thai* court's observation that "[a]n import duty exemption granted only for exported merchandise has *no* effect on home market sales prices" and, thus, "the duty exemption should have *no* effect on [normal value]."  635 F.3d at 1342 (emphasis added).  Thus, while Commerce properly may include exempted duties in its *cost* calculations, *id.* at 1342–43, *Saha Thai* cannot support a COS adjustment to price-based normal value.  Accordingly, the court finds that Commerce's COS adjustment is also barred by the unambiguous language of the regulation.[15]  This issue will be remanded to the agency for reconsideration consistent with the foregoing.

---

[15] Because the court finds that Commerce's COS adjustment was contrary to the relevant statutory and regulatory provisions, it need not resolve Plaintiffs' remaining challenges to the adjustments.  The court finds, however, that Icdas's argument that Commerce failed to comply with the court's instruction in *Habaş I* regarding the

## II.   Partial Adverse Facts Available

### A.  Legal Framework

When an interested party "withholds information" requested by Commerce,

"significantly impedes a proceeding," "fails to provide [] information by the deadlines for

submission of the information," or provides information that cannot be verified pursuant

to 19 U.S.C. § 1677m(i), Commerce shall use the "facts otherwise available" in making

its determination.  19 U.S.C. § 1677e(a)(2).  Commerce's authority to use the facts

otherwise available is subject to 19 U.S.C. § 1677m(c),[16] (d),[17] and (e).[18]

---

appropriate denominator to use in calculating the duty drawback adjustment lacks merit. *See* Icdas's Cmts. at 4.  Icdas fails to cite to record evidence to support its assertion or clearly explain its concern.  *See id*.  To the extent that Icdas asserts that Commerce impermissibly used total production as the denominator in calculating the duty drawback adjustment to U.S. price, the record shows that Commerce calculated the adjustment using the amount reported—and requested—by Icdas.  *See* Icdas Remand Calc. Mem. at 3.  To the extent that Icdas asserts that Commerce impermissibly used total production as the denominator to adjust Icdas's cost of production before adjusting normal value, Commerce did not impute exempted duties to Icdas's cost of production and, in any event, *Habaş I* did not address that calculation.  *Id.* at 2.

[16] Subsection (c) provides, *inter alia*, that when an interested party informs Commerce promptly after receiving a request for information "that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms," then Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."  19 U.S.C. § 1677m(c)(1).

[17] Subsection (d) provides the procedures Commerce must follow when a party files a deficient submission.  Pursuant thereto, if Commerce finds that "a response to a request for information" is deficient, "[it] shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews."  *Id.* § 1677m(d).  If any subsequent response is also deficient or untimely, Commerce, subject to subsection (e), may "disregard all or part of the original and subsequent responses."  *Id.*

[18] Pursuant to subsection (e), Commerce:

Additionally, if Commerce determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  *Id*. § 1677e(b)(1)(A).[19]  "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003).[20]  Before applying an adverse inference, Commerce must demonstrate "that the respondent['s] . . . failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from

---

shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements . . . if—
> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> (5) the information can be used without undue difficulties.

*Id.* § 1677m(e).

[19] Use of the facts available with an adverse inference may be referred to as "adverse facts available" or "AFA."

[20] *Nippon Steel* predates the TPEA.  However, the relevant statutory language discussed in that case remains unchanged.  *Compare* 19 U.S.C. § 1677e(b)(2012), *with* 19 U.S.C. § 1677e(b)(1)(2015).

its records." *Id.* at 1382–83.  "An adverse inference may not be drawn merely from a

failure to respond." *Id.* at 1383.  Rather, Commerce may apply an adverse inference

when "it is reasonable for Commerce to expect that more forthcoming responses should

have been made." *Id*.

### B.  Commerce's Use of Partial AFA Pre- and Post-*Habaş I*

In the underlying proceeding, Icdas informed Commerce that it was unable to

provide the identity of the manufacturer of subject merchandise for a small portion of its

affiliated resellers' sales.[21] *Habaş I*, 361 F. Supp. 3d at 1334–35.  Icdas provided

Commerce with data indicating that the "transactions missing manufacturer codes most

likely involved merchandise produced by Icdas" and, accordingly, "Commerce could

therefore consider Icdas as the manufacturer for those transactions." *Id.* at 1335.  For

the *Final Determination*, Commerce concluded that an adverse inference was warranted

when selecting from among the facts otherwise available to fill this evidentiary gap. *Id.*;

I&D Mem. at 4–6.  Commerce pointed to mill test certificates and waybills maintained by

Icdas and concluded that Icdas could have made a greater effort to obtain the missing

information from its affiliates records over which it had control. *Habaş I*, 361 F. Supp.

3d at 1335; I&D Mem. at 6, 31.  Commerce "assigned the highest non-aberrational net

---

[21] A "back-to-back" sale occurs "when a foreign producer sells subject merchandise to an affiliated exporter, who then sells it to a U.S. affiliate, who then sells it to an unaffiliated U.S. purchaser." *Habaş I*, 361 F. Supp. 3d at 1335 & n.33.  Icdas identified the manufacturer for its affiliated resellers' back-to-back sales; however, its affiliates did not track the manufacturer of merchandise sold in non-back-to-back sales. *Id.* at 1334–35.

price from Icdas'[s] downstream home market sales" as partial adverse facts available. *Habaş I*, 361 F. Supp. 3d at 1335 (alteration in original) (quoting I&D Mem. at 6, 30).

The court remanded Commerce's determination based on the agency's failure to comply with all statutory predicates to using adverse facts available and because "the agency's conclusion that Icdas failed to act to the best of its ability lack[ed] substantial evidence." *Id.* at 1336. Specifically, Commerce failed to comply with 19 U.S.C. § 1677m(c)(1) when it did not respond to Icdas's suggestion, accompanied by supporting documentation, that the agency could consider Icdas the manufacturer for the affected sales. *Id.* Additionally, "Commerce's finding that Icdas could have undertaken additional efforts to obtain mill test certificates and waybills purportedly kept by its affiliates to identify the missing manufacturer codes" was undermined by Icdas's statements that its affiliates simply did not have that information. *Id.*

In the Remand Results, Commerce further explained its previous findings that Icdas generates mill test certificates that identify the manufacturer of the subject rebar and "routinely provides documentation" identifying the manufacturer in its home market sales. Remand Results at 18–19 & nn.63–64 (citations omitted). Commerce explained that the missing information is crucial to Commerce's ability to identify sales of the foreign-like product upon which normal value is based for purposes of making an accurate comparison to U.S. price. *Id.* at 19, 45. Commerce therefore found that Icdas's and its "affiliates' failure to maintain control of the documentation concerning the original manufacturer of the foreign like product sold in the home market amounts to

inadequate record keeping" that significantly impeded the proceeding and merited the use of partial adverse facts available.  *Id.* at 19; *see also id.* at 44–45.

### C. Commerce's Determination to Use Partial AFA is Sustained

Icdas contends that it "offered a reasonable alternative" to the use of partial AFA, "which could have been applied as non-AFA" given that the missing information affected a small number of sales and "there was no willful withholding of information that would 'significantly impede' the proceeding."  Icdas's Cmts. at 14.  Icdas's arguments miss the mark.  "[S]ection 1677e(b) does not by its terms set a 'willfulness' or 'reasonable respondent' standard, nor does it require findings of motivation or intent."  *Nippon Steel*, 337 F.3d at 1383.  Instead, Commerce must make "a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information."  *Id.*  Here, Commerce found that Icdas had, at some time, generated records identifying the manufacturer of the subject rebar but failed to maintain control of that information.  Remand Results at 19, 44.  Icdas does not dispute these findings.  *See* Icdas's Cmts. at 13–14.  Icdas also does not dispute the importance of this information to Commerce's ability to calculate accurate dumping margins.  *See id.*; Remand Results at 45.  Accordingly, Commerce's determination to make an adverse inference as a result of Icdas' inadequate record keeping will be sustained.

### Conclusion and Order

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are remanded in part and sustained in part; and it is further

**ORDERED** that, on remand, Commerce shall, consistent with this Opinion, recalculate normal value without making a circumstance of sale adjustment related to the duty drawback adjustment made to export price (or constructed export price); and it is further

**ORDERED** that Commerce's Remand Results are sustained with respect to the agency's use of partial adverse facts available to Icdas; and it is further

**ORDERED** that Commerce shall file its remand redetermination on or before January 15, 2020; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.


/s/      Mark A. Barnett____
Mark A. Barnett, Judge


Dated: October 17, 2019___
         New York, New York